IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANGELA I. HENRY, PAULA R. BRITTIAN, OLLIS "BLEU" CARSON, OTIS COOK, DAVID DIXON, TONY GRANT, TIMOTHY E. HARVEY, WILLIE FRANK ROBINSON, AND MICHAEL E. SHIELDS, | ) ) ) ) ) ) | Civil Action No. |
| | ) | JURY TRIAL DEMANDED |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LEVY PREMIUM FOODSERVICE LIMITED PARTNERSHIP, d/b/a LEVY RESTAURANTS, | ) ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

## COMPLAINT

COME NOW Angela I. Henry, Paula R. Brittian, Ollis "Bleu" Carson, Otis Cook, David Dixon, Tony Grant, Timothy E. Harvey, Willie Frank Robinson, and Michael E. Shields (collectively, "Plaintiffs"), by and through undersigned counsel, and file this their Complaint, and show the Court as follows:

## JURISDICTION AND VENUE

1.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.   This is a complaint of unlawful employment discrimination on the basis of Plaintiffs' race and retaliation pursuant to Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981").

2.

The unlawful employment practices alleged in this Complaint were committed within this district.  In accordance with 28 U.S.C. § 1391, venue is appropriate in this Court.

## PARTIES

3.

Plaintiffs are citizens of the United States of America, and are subject to the jurisdiction of this Court.

4.

Defendant, Levy Premium Foodservice Limited Partnership ("Defendant"), is qualified and licensed to do business in Georgia, and at all times material hereto has conducted business within this District.

5.

Defendant may be served with process by delivering a copy of the summons and complaint to its registered agent for service in Georgia, Corporation Process Company, 2180 Satellite Boulevard, Suite 400, Duluth, Georgia 30097.

6.

Defendant is a food service management company, and Levy Restaurants ("Levy") is a subsidiary that provides dining concessions and food service to guests at various venues.  During all times relevant to this action, Levy or its predecessor company, MGR Food Services, had one or more contracts for overseeing dining concessions and food service at the Georgia World Congress Center (GWCC), the Georgia Dome, and Centennial Olympic Park ("the Venues").

7.

At all times relevant to this action, Plaintiffs were employees of Levy.

## FACTUAL ALLEGATIONS

8.

On approximately January 1, 2006, Levy formally took over one or more existing contracts at the Venues from MGR.  However, Levy had been involved in contract implementation and management since at least 2005.

9.

At the time Levy formally took over the existing contracts at the Venues in January 2006, Levy continued the employment of certain MGR personnel, changing or retaining the job titles of most, if not all, salaried personnel to "Manager."

10.

At the time Levy formally took over the existing contracts at the Venues in January 2006, more than 50 of the Managers at the Venues were African-American, and approximately ten of the Managers at the Venues were Caucasian.

11.

Around late December 2007, at a mandatory meeting for all current managers, who were predominantly African-American at the time, a Caucasian representative of Levy's upper management made a statement to the effect that Levy "needs diversity in this building."

12.

By June 2010, more than 50 of the Managers at the Venues were Caucasian and fewer than ten of the Managers at the Venues were African-American.

13.

After Levy took over the MGR contract at the Venues, events that were expected to have a majority of African-American attendees were routinely handled differently from other events.   For example, security guards were stationed in the bathrooms, alcoholic consumption was restricted, and concession receipts were brought to the office more frequently for such events.

14.

In approximately March 2007, Ellen Feit was hired as Assistant Director of Operations of Levy Restaurants at the GWCC.  Feit remained in that position until approximately June 2008.  Feit is Caucasian.  She was replaced in August 2008 by Brian Lapinskas, who is also Caucasian.

15.

In approximately August 2008, Chris Smith was hired as Director of Operations of Levy Restaurants at the GWCC. Smith is Caucasian.

16.

In approximately November 2009, Scott Sweeney replaced Ben Witte as Director of Operations of Levy Restaurants at the Georgia Dome.  In 2008, Larry Carlson was hired as Assistant Director of Operations at the Georgia Dome. Sweeney and Carlson are Caucasian.

17.

After Levy took over the MGR contract, Levy significantly reduced or eliminated the number of minority-owned vendors and temporary agencies utilized at the Venues.

18.

Levy hired a majority-white group, Master's Commission, to provide the equivalent of temporary staffing even when African-American employees who had formerly worked in the Venues were willing and able to work the hours.

**Plaintiff Angela Henry**

19.

Plaintiff Henry was hired by MGR around July 26, 1996, as a part-time Server and was subsequently promoted to department head.

20.

When Levy took over the MGR contract for the Venues, Plaintiff Henry's job title was and continued to be Beverage Manager, with responsibilities for planning and coordinating all beverage events throughout the WGCC and Centennial Olympic Park.

21.

During the time Plaintiff Henry worked for MGR before Levy took over the MGR contract, Henry's accolades included being selected as Employee of the Quarter twice and being praised in public by MGR's owner Phil Noyes as "the best beverage manager [he] ever had."

22.

When Levy took over the MGR contract, Henry's African-American supervisor was replaced by a sequence of Caucasian upper management including Peter Minervini, Director of Banquets and Hosted Services at the GWCC, and Garl Mezello, who replaced Minervini; Ellen Feit and her successor, Brian Lapinskas, Assistant Directors of Operations; and Chris Smith, Director of Operations.

23.

In October 2007, Feit gave Henry the first disciplinary action she had ever received.

24.

Shortly after the mandatory meeting for all current managers at which the Caucasian representative of Levy's upper management stated that the company "needs diversity in this building," in early January 2008, Feit gave Henry her first sub-standard performance review, and Henry was placed on her first 90-day

Performance Development Plan (PDP), supposedly because she had earned

unacceptably low performance ratings for the 2007 calendar year.

25.

Being placed on a PDP prevented Plaintiff Henry and other Levy employees

from receiving bonuses or merit raises, which Henry had routinely received in the

past.  Henry was confused, because she had been singled out as being the only

manager at her two venues to have met departmental operational goals in 2007,

and Beth Bastien, (Caucasian) Purchasing Director, had sent out an e-mail to that

effect.

26.

Feit resigned about this time after an African-American female manager Feit

had fired (who on information and belief was named Deborah Shipman) was

reinstated; Henry had signed an affidavit in support of that manager.

27.

After Shipman was reinstated, Plaintiff Henry's PDP was extended for 30

more days without any explanation, after which it was signed off as completed by

her new (Caucasian) supervisor, Peter Minervini, in May 2008.

28.

After working with Plaintiff Henry, Minervini commented to her that he had been watching her and she did "a damn good job."  In January 2009, Minervini signed a performance evaluation with no identified areas in need of improvement.

29.

In May 2009, Plaintiff Henry received a second write-up, this time from Minervini, related to missing the deadline to report inventory at an event that involved Beverage, Banquets, and Kitchen personnel.  When she questioned its validity, Minervini told her that he was acting at the direction of others.  On information and belief, the Caucasian managers of Banquets and Kitchen received no discipline for their own lateness, which had caused Beverage to miss the deadline.

30.

Plaintiff Henry complained to Tabitha Tobin, Director of Human Resources, that she should not have been the only manager of the three written up, and Tobin later told Henry that the write-up would be removed from her file.

31.

Later in 2009, Chris Smith wrote Henry a memorandum via e-mail expressing his "disappointment" in her department during an event.  Henry responded by questioning why she was singled out for criticism.

32.

In December 2009, Henry received yet another write-up for problems that arose at an event for which she had requested, but been denied, additional full-time supervisory personnel, while the (Caucasian) Banquets and Kitchen managers had routinely been provided additional help.

33.

In January 2010, Henry was placed for the second time on a PDP.  Prior to being placed on the plan, Garl Mezello, the (Caucasian) Director of Banquets and Hosted Services, told Henry that he had given her a positive evaluation on her annual performance review, stating that he had "no problem" with her because as far as he was concerned, she did a "great job."  Mezello told Henry that Chris Smith had read the positive review and determined that he would rewrite the review himself.

-10-

34.

In early 2010, Plaintiff Henry complained to Corporate Human Resources as well as to HR Director Tobin that she was receiving undeservedly low performance ratings and was not receiving needed support (including basic equipment and supplies as well as personnel) because of her race.  Tobin referred Henry to the EEOC, and Henry filed a charge with the EEOC on March 29, 2010, alleging discrimination on the basis of race and gender.

35.

The PDP stipulated that Plaintiff Henry would have weekly meetings with Lapinskas, which never occurred.

36.

Shortly after filing her EEOC charge, on May 14, 2010, Henry was again written up, this time allegedly for mishandling an incident with her subordinates. A similar situation in the Kitchen/Culinary department did not result in any disciplinary action against manager Frank Abbinanti, who in addition to being Caucasian had not filed an EEOC charge.

37.

Plaintiff Henry was again written up on June 10, 2010, this time for supposedly failing to schedule employees for alcohol training, which Caucasian manager Eric Herman had failed to do without consequences.

38.

On June 16, 2010, Plaintiff Henry was again written up and suspended, this time falsely accused of "keying in" a terminated employee – something she was unable to do given her restricted administrative rights.  Knowing the write-up was bogus, Henry complained to Chris Smith that the write-up was meritless.

39.

On June 22, 2010, Chris Smith informed Plaintiff Henry that she was being discharged for insubordination.

40.

Plaintiff Henry was replaced by a Caucasian, Julian Bonfardin.

**Plaintiff Paula Brittian**

41.

Plaintiff Brittian was hired by MGR on March 21, 2005 as Payroll Coordinator.   Plaintiff Brittian's primary duties consisted of processing payroll for salaried and hourly employees at the Venues.  She reported to John Sainsbury,

General Accounts Manager, and Lori Cashwell, Accounting Manager.  Sainsbury and Cashwell are Caucasian.

42.

When Levy took over the MGR contract in 2006, Plaintiff Brittian's title was changed to Payroll/Account Manager and Sainsbury's title was changed to Controller.

43.

Around April 5, 2006, Plaintiff Brittian complained in writing to Michelle Spicer, Human Resources Director, that she was being harassed by Sainsbury and Cashwell.

44.

After Plaintiff Brittian complained to Human Resources in April 2006, Sainsbury pressured at least one other employee to make false statements to Human Resources about Plaintiff Brittian; repeatedly asked Human Resources how he could get rid of Plaintiff Brittian; asked Human Resources to write Plaintiff Brittian up; and suspended Plaintiff Brittian for supposed problems with payroll.

45.

On about August 3, 2006, Plaintiff Brittian filed a charge of discrimination with the Equal Employment Opportunity Commission alleging discrimination on the basis of race and sex.

46.

Shortly after Plaintiff filed her August 3, 2006 EEOC charge, Sainsbury placed Plaintiff Brittian on "progressive coaching," which supposedly included weekly meetings with her (Caucasian) managers.

47.

Sainsbury stated to at least one other Levy employee that he would use "progressive coaching" to get rid of Plaintiff Brittian.

48.

Plaintiff Brittian's managers never held weekly meetings with her during the time she was on "progressive coaching."

49.

After Plaintiff Brittian filed her August 3, 2006 charge, Sainsbury and Cashwell took retaliatory steps against her, including but not limited to yelling at her, disparaging her to her coworkers, throwing papers at her, and falsely accusing her of making errors.

50.

On or about January 17, 2007, Plaintiff Brittian filed a second EEOC charge alleging retaliation for having filed her first charge.

51.

After Plaintiff Brittian filed her second EEOC charge, John Sainsbury and Cashwell escalated their retaliation, giving her an undeserved unfavorable performance review, assigning her extra work by manipulating her reports so that they required reworking, and requiring her to request permission in writing whenever she needed to leave her desk, even when she wanted to go to the bathroom or to lunch.

52.

Sainsbury stated to at least one other Levy employee that he was aware that Plaintiff Brittian had filed charges with the EEOC but that he intended to fire her before she could pursue her claims.

53.

Sainsbury left Levy at some time in 2007.  Cashwell took Sainsbury's place briefly and then was replaced by Victoria Shirk as Controller in the latter part of 2007.

54.

After Victoria Shirk assumed the Controller position, Shirk called Plaintiff Brittian to her office and asked Brittian why she had filed an EEOC complaint. During the conversation, Shirk told Brittian that an upper manager had stated in a meeting that the manager had problems with her (Brittian) filing a complaint and wanted her (Brittian) to be aware that management had spoken to Shirk about her. The manager told Shirk that management had already planned to "handle the problem."

55.

In 2007 and continuing through 2008, Plaintiff Brittian's workload was increased unnecessarily as she was directed to perform work that should have been assigned to others, and was told to repeat work she had already done after others had manipulated the data to make it appear that Plaintiff Brittian had made accounting errors.  The load placed upon Plaintiff Brittian was so conspicuously heavy that Shirk offered to help out Plaintiff Brittian and repeatedly told Plaintiff Brittian that she (Shirk) was not involved in those decisions.

56.

In approximately October 2008, Shirk told Plaintiff Brittian that management had plans to do something "unfair" to Brittian and that she hoped Brittian understood that she (Shirk) had nothing to do with the decision.

57.

On or about November 14, 2008, Shirk informed Plaintiff Brittian that Plaintiff Brittian was being laid off because her position was being eliminated and payroll functions moved to Chicago.

58.

Plaintiff Brittian's performance had nothing to do with the termination of her employment.

59.

Other Levy employees were given the opportunity to transfer to different locations when their jobs were eliminated, but Plaintiff Brittian was not provided any such opportunity.

60.

Other Levy employees subjected to a lay-off were given a severance package, but Plaintiff Brittian was not offered any severance package.

61.

Plaintiff Brittian was the only person in her work group whose job was eliminated in November 2008.

62.

Payroll functions for Venue employees did not move to Chicago for months after Plaintiff Brittian's employment was terminated.

63.

Plaintiff Brittian's job duties were taken over by Tom Hughes.  Hughes is Caucasian.

**Plaintiff Ollis "Bleu" Carson**

64.

Plaintiff Carson was hired by MGR on or about September 27, 1999 to work in the Human Resources department.  He was promoted to Concessions Manager at the GWCC in 2001.

65.

When Levy took over the MGR contract for the Venues, Plaintiff Carson's title remained Concessions Manager at the GWCC.

66.

In 2007, Plaintiff Carson complained to Tabitha Tobin in Human Resources that he was not being paid fairly in comparison with Scott Mika, a younger Caucasian who, even though he had come in without much experience, had started out at the same salary as Plaintiff Carson and subsequently was paid more than Carson. Plaintiff Carson also complained to managers Plaintiff Harvey and Derek Banks that new managers being hired in were younger Caucasians and he felt that the hiring decisions were racially motivated.

67.

In 2008, Plaintiff Carson found out that the position of Suites Manager at the Georgia Dome had been vacated by the younger Caucasian man that had occupied the position. Even though the position had not been posted, Plaintiff Carson told Tobin in Human Resources that he wanted to apply. On information and belief, the position was posted only after Carson applied for it. After several weeks, Carson had a telephone interview with the new (Caucasian) General Manager over Suites at the Dome, Darryl Willms. Carson was encouraged because Susan Fink (Caucasian), Levy's Regional Director, had told Carson that Levy wanted to hire from within. However, after hearing nothing for several weeks, Carson was told

that the job had been filled.  A Caucasian man named Tim (last name unknown) was hired from outside Levy for the position.

68.

In November or December 2008, Plaintiff Carson complained to Brian Lapinskas, Caucasian Assistant Director of Operations, about what Plaintiff Carson believed to be discriminatory pay and promotion practices.

69.

In January 2009, Plaintiff Carson was informed that his position was being eliminated because the company was cutting back and restructuring.  On or about February 2, 2009, Plaintiff Carson's employment was terminated.

70.

Plaintiff Carson's performance played no role in the termination of his employment.

71.

Plaintiff Carson's position was not eliminated.  After Carson's position was supposedly eliminated, Levy hired or transferred several Caucasians into the position of Concession Manager including Scott Mika, Julian Bonfardin, and Shawn Toelz.

**Plaintiff Otis Cook**

72.

Plaintiff Cook began working for MGR in 1997 as a supervisor.  After leaving the company briefly, he was re-hired by Ben Witte, Cook's former supervisor at MGR, on or about October 2, 2006 as a Senior Manager in Concessions at the GWCC.

73.

In late 2008, the Concessions General Manager position at the GWCC became vacant when Levy terminated the employment of African-American General Manager Plaintiff Harvey.  Plaintiff Cook subsequently performed all General Manager duties for approximately six months.

74.

In about March 2009, the open GWCC General Manager position was posted.

75.

After Plaintiff Cook expressed his interest in the GWCC General Manager position, the posting of the position was taken down.

76.

When the GWCC General Manager position again became available in June 2010, another Caucasian, Eric Herman, was hired.  This time, the job was not posted at all.  Instead, Chris Smith just placed Herman in the position even though Cook had been performing the job for a year-and-a-half.

77.

When Plaintiff Cook asked Smith why he did not get the General Manager job, Smith told Cook was told that he (Plaintiff Cook) did not have the "American look."

78.

Plaintiff Cook also questioned Tabitha Tobin in Human Resources about why he was passed over for the position.

79.

In July 2010, after his meetings with Smith and Tobin, Plaintiff Cook was placed on a Performance Development Plan (PDP) supposedly for job performance concerns, namely that he had not been training the new General Manager.  He completed the PDP around August 2010.

80.

Plaintiff Cook was not given the support or resources necessary to enable him to accomplish the goals outlined in his PDP.   For example, he was told to hire more staff at the same time he was told not to schedule employees.

81.

On about September 17, 2010, shortly after Smith had congratulated Plaintiff Cook for doing a "great job" on a major event, Smith terminated Plaintiff Cook's employment, informing Plaintiff Cook that "corporate" had felt Plaintiff Cook was not living up to his responsibilities.

**Plaintiff David Dixon**

82.

Plaintiff Dixon began working for MGR in approximately 1992 as an Event Supervisor.  He was subsequently promoted to a management position.

83.

When Levy took over the MGR contract, Plaintiff Dixon assumed the position of Assistant Restaurant Services Manager at the GWCC.

84.

In 2007, Plaintiff Dixon filed a charge with the Equal Employment Opportunity Commission alleging that he had been subjected to discrimination

based on his age and race after some of his job duties were given to a younger Caucasian employee and he had been suspended twice in a six-month period for unjustified reasons.

85.

After Plaintiff Dixon filed his EEOC charge, his performance evaluation scores declined to the point that for the first time he was no longer eligible for receiving bonuses or raises.

86.

In 2008, Brian Lapinskas became Plaintiff Dixon's supervisor.

87.

In approximately May 2009, Lapinskas placed Plaintiff Dixon on a Performance Development Plan (PDP), supposedly for not properly supervising Dixon's subordinates.

88.

Prior to the expiration of the 90-day PDP period, Lapinskas informed Plaintiff Dixon that his position had been eliminated and directed Dixon to leave the building.

89.

Plaintiff Dixon's position was not eliminated, as a younger Caucasian was placed in Dixon's former position and assumed Dixon's former job duties.

**Plaintiff Tony Grant**

90.

Plaintiff Grant was hired approximately July 5, 2000, by MGR. His original position was a Stewarding Manager at the Georgia Dome.  Grant was promoted to Club Level Manager before Levy took over management of the Dome by Charlie McNair, an African-American man.

91.

When Levy took over the MGR contract, Plaintiff Grant was transferred to the position of Senior Commissary/Warehouse Manager at the Georgia Dome.  In that position, he managed from behind the scenes, and had little to no contact with the public.  A Caucasian man named Scott Boatman took over as Club Level Manager, a position involving frequent interaction with the public.

92.

Plaintiff Grant received his first written reprimand in September 2010, supposedly because Plaintiff Grant had spent money to get ice for an event, when Plaintiff Grant had done so because he had not been given sufficient funds to

replace faulty ice machines and the machines did not produce enough ice for the event.

93.

In October 2010, Scott Sweeney, (Caucasian) Director of Operations at the Georgia Dome, placed Plaintiff Grant on a Performance Development Plan (PDP). According to the PDP, the primary reason for being placed on the plan was identical to the written reprimand Grant had received a few weeks prior.

94.

In late November 2010, Plaintiff Grant was reprimanded verbally for a problem that had occurred when Plaintiff Grant was not at work, and that had been taken care of by Plaintiff Grant immediately upon his return and several hours before the event began.

95.

Plaintiff Grant was subjected to other differential treatment, including having his ideas not taken seriously at meetings.  Specifically, beginning in September 2010, Grant developed and executed plans for his department, but Sweeney asked Grant's Caucasian counterpart for the information that Grant had already developed.

96.

Additionally, Sweeney told Plaintiff Grant that he would not grant any more staff support or budget supplements, while similar requests made by Caucasian managers were granted.

97.

On about December 1, 2010, Plaintiff Grant complained to Latrice Ridley, Senior Human Resources Manager for the Dome, that he thought that he was being treated differently because he was not "one of the good old boys" and specifically referenced his Caucasian co-workers.

98.

Approximately one week after Plaintiff Grant had complained to Human Resources, Sweeney's assistant fired Plaintiff Grant.

99.

Plaintiff Grant's replacement, Jim Marshall, was Caucasian.

100.

While Plaintiff Grant served as Senior Commissary Manager, he expressed his interest in becoming the Purchaser for the Dome. The position became available after May 2010 and was filled by a Caucasian man. The job was never posted.

**Plaintiff Timothy E. (Tim) Harvey**

101.

Plaintiff Harvey was hired by MGR on or about January 23, 2000 as an Assistant Restaurant Manager.  In approximately September 2000, he was promoted to Restaurant Services Manager.

102.

When Levy took over the MGR contract, Plaintiff Harvey's job title was changed to the General Manager of Concessions at the GWCC.

103.

In early 2008, Plaintiff Harvey was recognized and received an award for exemplary customer service.

104.

Plaintiff Harvey won that award even though his department lacked the manpower support and financial resources bestowed upon other departments. Plaintiff Harvey had complained to Tabitha Tobin about the disparity between the departments and his belief that his department was treated differently than others because of his race and the racial makeup of his team.

105.

In February 2008, within a few months of Plaintiff Harvey's having received an award for exemplary customer service and of Plaintiff Harvey complaining of race discrimination, Ellen Feit, the Caucasian GWCC Director of Operations at the time, placed Plaintiff Harvey on a 90-day Performance Development Plan.

106.

Feit's stated reason for placing Plaintiff Harvey on a PDP was that the department was not meeting budgets on food and labor; however, those budgets were satisfied at the time Harvey was placed on the PDP.

107.

While Harvey was on the PDP, his team met the targets set for his department even though the targets kept increasing.

108.

Prior to being placed on the PDP, Plaintiff Harvey had received satisfactory performance reviews and had received no written reprimands of any kind.

109.

On or about September 29, 2008, Plaintiff Harvey's employment was terminated by Susan Fink, Regional Director.  When Harvey questioned Fink on the specifics reasoning for his termination, Fink simply said that the company

wanted to go in another direction.  Harvey was told that he was meeting

performance goals and that his PDP had nothing to do with his discharge.  Fink is

Caucasian.

## 110.

When Plaintiff Harvey's position was officially filled, he was replaced by a

Caucasian.

**Plaintiff Willie Frank Robinson**

## 111.

Plaintiff Robinson began working for MGR on or about August 2, 1994 as a

Suite Runner at the Georgia Dome.

## 112.

Plaintiff Robinson's career at MGR progressed rapidly, and he ultimately

was promoted to serve as Banquet Manager at Levy properties in Missouri,

Kentucky, Illinois, Florida, and Wisconsin.

## 113.

When Levy took over the MGR contract at the GWCC, Plaintiff Robinson

was transferred to the GWCC as Banquet Manager.  Plaintiff Robinson reported to

Garl Mezello, Director of Banquets, who reported to Chris Smith, Director of

Operations for the GWCC.

114.

While working at the GWCC under Chris Smith, Plaintiff Robinson was not given the support or resources that were provided to his white counterparts.  For example, Plaintiff Robinson had to manage large events alone, whereas white Banquet Managers received supplemental management assistance; Plaintiff Robinson was assigned unqualified staff or an insufficient number of staff for his events, whereas white Banquet Managers were assigned more and more qualified staff; and Plaintiff Robinson's days off were often split, whereas white Banquet Managers' schedules often enabled them to take several days off in a row.

115.

Plaintiff Robinson complained on multiple occasions to Chris Smith and to Mark Schwab, General Manager, that he was not receiving the assistance that was being provided to his white counterparts.

116.

Plaintiff Robinson received written reprimands when in fact he was following what he had been told to do and/or other (Caucasian) Banquet Managers had done the same thing with no repercussions.

117.

Plaintiff Robinson also spoke to Human Resources about the treatment he was receiving at the hands of Chris Smith.

118.

In late 2010, Plaintiff Robinson learned that Andrew Heefner, a Caucasian, had been hired as Senior Banquet Manager.  On information and belief, Heefner had no banquets experience yet was more highly compensated than was Plaintiff Robinson.  Plaintiff Robinson was never informed of any opportunity to apply for a Senior Banquets Manager position, and the job vacancy was never posted in Robinson's work area.

119.

Plaintiff Robinson complained to Human Resources that Heefner had been brought in at a position higher than his.

120.

After Plaintiff Robinson complained to Human Resources that Heefner had been brought in as a Senior Banquet Manager, Plaintiff Robinson noticed that his own title had been changed to "Senior Banquets Manager" on the facilities schedule.  However, Plaintiff Robinson's compensation had not changed, and in

fact, Plaintiff Robinson was told that he was at the top of the compensation for the Banquet Manager position.

121.

After Plaintiff Robinson asked Human Resources why his compensation had not changed since his position was now Senior Banquet Manager, the word "Senior" was removed from his job title.

122.

On or about May 20, 2011, Plaintiff Robinson's employment was terminated.  The stated reason for firing Plaintiff Robinson was that the company was going in a new direction.

**Plaintiff Mike Shields**

123.

Plaintiff Shields was hired by MGR on or about October 16, 1997 as an hourly Supervisor at the Georgia Dome.  He was promoted in February 1998 to a salaried position of Assistant Beverage Manager and in March 2000 to Beverage Manager. While Shields worked for MGR he was named Employee of the Quarter.

124.

When Levy assumed the contract for the Venues, Plaintiff Shields maintained his position as Beverage Manager for the Georgia Dome.  When Levy

took over, Larry Carlson, Director of Operations for the Georgia Dome, became his supervisor. Carlson is Caucasian.

125.

In approximately December 2008, Carlson gave Plaintiff Shields a low performance rating.  This was the first sub-par performance rating Plaintiff Shields had ever received.  When Shields told Carlson he knew what was going on, Carlson replied, "Be on your toes."

126.

Plaintiff Shields was placed on a 90-day Performance Development Plan (PDP) in January 2009.  Levy cited to a few reasons for the PDP, including communicating with the Comptroller regarding financial costs and IPOE for carbonated beverages, and analysis of the number of portable bars, responsibilities he had not been told he had prior to being placed on the PDP.

127.

In early 2009, Plaintiff Shields received his first, and only, written reprimand, for being late with payroll.  Plaintiff Shields was surprised to be formally disciplined, as Caucasian managers, including Darryl Willms and Brian Lapinskas, had on several occasions been late with payroll with no consequences.

128.

In early 2009, Plaintiff Shields complained to Tabitha Tobin in Human Resources that he was being treated differently because of his race, that corporate rules were not being followed, and that his treatment was unfair.

129.

When Plaintiff Shields met with Carlson 60 days into Shields' PDP, Shields was meeting the goals assigned to him.

130.

Plaintiff Shields filed an EEOC charge in the spring of 2009 after his second meeting with Carlson concerning the PDP.

131.

Plaintiff Shields was not given the support or resources necessary to enable him to optimally fulfill his job functions. For example, he was not permitted to have equipment necessary to secure the Beverage area.  Additionally, Caucasian managers received personnel support to complete assigned tasks when Shields's requests for similar assistance were denied.

132.

On or about May 1, 2009, Carlson terminated Plaintiff Shields's employment.  The stated reason for the discharge was that Shields had failed to

meet his PDP goals.  However, Shields had in fact accomplished all of the written goals.

133.

Plaintiff Shields's replacement, Travis Tucker, was Caucasian.

134.

On information and belief, Plaintiffs' treatment was not isolated, but was part of a pattern and practice by Defendant to increase "diversity" at the Venues by replacing African-American managers with Caucasians who Levy thought had the "American look" and were as such better suited to interface with the public.

<strong><u>CLAIMS FOR RELIEF</u></strong>

<strong><u>COUNT I:  DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981</u></strong>

135.

Defendant engaged in a pattern and practice of discriminating against African-Americans in management positions by, *inter alia*, making disparaging comments about African-Americans including calling them the "n" word and "monkeys;" holding them to different performance standards than their Caucasian counterparts; providing them with less equipment and personnel than their Caucasian counterparts; placing them on Performance Development Plans and then denying them the support and resources necessary to meet established goals;

denying them promotional opportunities either by failing to post such opportunities or hiring less-qualified Caucasians; restricting the use of African-American temporary personnel; mandating additional requirements only for African-American events; and ultimately firing African-American managers for pretextual reasons and replacing them with Caucasians who were less qualified and/or who had not complained about Defendant's discriminatory practices.

136.

Specifically, Defendant held Plaintiffs to different performance standards than their Caucasian counterparts, reprimanding them for supposed infractions that their Caucasian counterparts had committed without consequence while providing them with less support and resources; and/or placing them on Performance Development Plans or "progressive coaching" without the support (such as "coaching" meetings or consistent performance goals) and resources (such as personnel, supplies, and equipment) necessary to meet established goals.

137.

Defendant also denied promotional opportunities to Plaintiffs Carson, Cook, and Robinson, by failing to post such opportunities, removing the posting after an African-American applied, and then selecting Caucasian candidates with less

experience or qualifications; and essentially demoted Plaintiff Grant by removing him from, and placing a Caucasian into, his high-profile management position.

138.

Defendant also discriminated against Plaintiffs Brittian and Dixon by, *inter alia*, falsely indicating that their positions were being eliminated when in fact their job duties were assumed by Caucasians.

## COUNT II:  RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

139.

Defendant engaged in a pattern and practice of retaliating against African-Americans who complained of discriminatory treatment by, *inter alia*, failing to properly investigate and/or respond to their stated concerns, writing them up for bogus reasons, placing them on Performance Development Plans without the support or resources needed to get off of them, and terminating their employment.

140.

Specifically, Defendant retaliated against Plaintiff Henry by subjecting her to unwarranted discipline and then firing her after she complained internally and filed an EEOC charge and then replacing her with a Caucasian; against Plaintiff Brittian after she complained internally and filed EEOC charges by placing her on "progressive coaching," increasing her workload without additional resources,

falsifying her data to make her redo her work needlessly, forbidding her to move freely about the office, terminating her employment in a supposed "lay-off" but providing no severance as had been provided to other laid-off personnel, and replacing her with a Caucasian; against Plaintiff Carson after he complained internally by denying him good-faith consideration for promotional opportunities and then telling him that his position had been eliminated when in fact his job duties were assumed by a Caucasian; against Plaintiff Cook after he complained internally by firing him; against Plaintiff Dixon after she filed an EEOC charge by giving her an undeservedly low performance evaluation, placing her on a PDP, and supposedly eliminating her position, but then replacing her by a Caucasian; against Plaintiff Grant after he complained internally by firing him and replacing him with a Caucasian man; against Plaintiff Harvey after he complained by placing him on PDP, firing him, and replacing him with a Caucasian man; against Plaintiff Robinson after he complained internally by failing to provide promotional opportunities and firing him because the company was going into a "new direction" and assigning his duties to Caucasians; and against Plaintiff Shields by denying him equipment and personnel after he complained internally and filed an EEOC charge and then firing him even though he had met performance goals and replacing him with a Caucasian.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)        General damages for mental and emotional suffering caused by Defendant's misconduct;

(b)        Punitive damages based on Defendant's willful, malicious, reckless, and deliberate acts;

(c)        Special damages for lost wages and benefits and prejudgment interest thereon;

(d)        Reasonable attorneys' fees and expenses of litigation;

(e)        Trial by jury as to all issues;

(f)        Prejudgment interest at the rate allowed by law;

(g)        Declaratory relief to the effect that Defendant has violated Plaintiffs' statutory rights;

(h)        Injunctive relief of reinstatement, or front pay in lieu thereof, and prohibition of Defendant from further unlawful conduct of the type described herein; and

(i)        All other relief to which Plaintiffs may be entitled.

Respectfully submitted the 6th day of October, 2011.

**BARRETT & FARAHANY, LLP**

/s/ Eleanor M. Attwood
Eleanor Mixon Attwood
Georgia Bar No. 514014
Benjamin F. Barrett
Georgia Bar No. 039586

1100 Peachtree Street
Suite 500
Atlanta, GA 30309
(404) 214-0120
Facsimile (404) 214-0125
eleanor@bf-llp.com
ben@bf-llp.com